

# EXHIBIT C

Case 9:06-cv-80170-JIC   Document 4   Entered on FLSD Docket 03/03/2006   Page 1 of 65

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DAVID J. FEINGOLD.

    Plaintiff.

v.

STEVEN S. BISS.

    Defendant.

_____/

**CASE NO. 06 cv 80170 - COHN**
**Magistrate Judge Snow**



## MEMORNANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

    Plaintiff. DAVID J. FEINGOLD ("Feingold" or Plaintiff) by and through his undersigned counsel. hereby files this Memorandum in opposition to the Defendant STEVEN S. BISS' ("Biss" or referred to as "Defendant") Motion To Dismiss and states:

## GENERAL ALLEGATIONS

    1.    This cause of action was originally filed in Circuit Court in Palm Beach County. Florida.

    2.    On or about February 22. 2006 the Defendant filed a notice of Removal to remove this case to Federal Court in the Southern District of Florida.

    3.    On or about February 23. 2006 the Plaintiff filed a Motion for Remand to send this case back to Circuit Court in Palm Beach County. Florida.

    4.    Since this Court has not yet ruled on the Motion for Remand and since there is a Motion to Dismiss presently pending. the Plaintiff hereby files its response to

1

the Defendant's Motion to Dismiss out of an abundance of caution, however, the Plaintiff does not agree that this Federal Court has jurisdiction over this matter and this Memorandum is being filed herewith, but it is anticipated that this Memorandum will be reviewed and decided upon by the Circuit Court once this Court remands this case.

5.     This memorandum will address multiple defects in the Defendant's argument.   First, the law will be discussed as the Defendant's motion is almost completely devoid of law and makes assertions, which as will be seen, are completely incorrect in light of Florida's law of slander and the appropriateness of jurisdiction regarding the same.   Next, the credibility of the Defendant will be discussed and various examples of the complete lack of credibility of the Defendant since the Defendant has filed an affidavit of questionable worth and asks this Court to accept the same.   Finally, affidavits in contravention of the Defendant's motion to dismiss are attached hereto and will be discussed as further grounds to deny the motion to dismiss.


## The Applicable Law

The Defendant has stated that he has filed his motion to dismiss under Federal Rule 12(b)(2) and 12(b)(6). Rule 12(b)(2) requires the dismissal of a complaint for lack of jurisdiction over the person and Rule 12(b)(6) requires dismissal for failure to state a claim upon which relief can be granted.

First with regards to Federal Rule 12(b) it is settled law in Florida that on a motion to dismiss, the Court considers the allegations of the complaint as true, in order to determine if the jurisdiction of a federal district court has been properly invoked. Barton v. Eustis, 415 F.Supp 1355 (MD. Fla. 1976); *McNutt v. GMAC*, 298 U.S. 178,

2

182, 56 S. Ct. 780, 80 L. Ed. 1135 (1935). ; *Linder v. Portocarrero*, 963 F.2d 332, 334

(11th Cir. 1992)(citing *Quality Foods de Centro Am., SA., v. Latin Am. Agribusiness*

*Dev. Corp. S.A.,* 711 F.2d 989, 994-95 (11th Cir. 1983)). If the motion to dismiss asserts

a lack of subject matter jurisdiction, the plaintiff has the burden of showing that it has

properly invoked the court's jurisdiction. *Strickland v. Holiday RV Superstores,* 817 F.

Supp. 951, 952 (M.D. Fla. 1993)(citing **Barton v. City of Eustis, 415 F. Supp. 1355,**

**1357 (M.D. Fla. 1976))**.

      If the motion to dismiss asserts a lack of personal jurisdiction over the defendant,

the plaintiff must establish a *prima facie* case of personal jurisdiction to survive the

motion to dismiss. *See Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir. 1990). However,

the issue of subject matter jurisdiction is "fundamentally preliminary" to the issue of

personal jurisdiction and, thus, must be decided first. *See Leroy v. Great W. United*

*Corp.,* 443 U.S. 173, 180, 61 L. Ed. 2d 464, 99 S. Ct. 2710 (1979).   To dismiss a claim

for failure to state a claim upon which relief can be granted, the defendant must

demonstrate that the plaintiff can prove no set of facts which would entitle it to relief. *See*

*Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *accord Powell*

*v. Lennon,* 914 F.2d 1459, 1463 (11th Cir. 1990).

      Since this Federal Court presently has this matter pending due to a notice of

removal filed by the Defendant based on his improper assertion that there is jurisdiction

based upon diversity[1], the analysis will be based upon Florida substantive law pursuant to

---

[1] This Court has already been advised that this case is pending in Federal Court due to a notice of
removal filed by the Defendant. There is presently pending a Motion for Remand for which it is
believed that this Court will grant and thereby send this case back to the Circuit Court in Palm
Beach County, Florida.

the Erie Doctrine. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The case presently pending asserts that Defendant Biss committed the tort of slander within the state of Florida.  Florida Statute 48.193(1)(b) provides that: (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits that person, and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following: . . . (b) commits a tortious act within the State.

The complaint in this case states that Defendant Biss committed the tortious act of Slander in Palm Beach County, Florida by publishing statements that are slander per se in Palm Beach County, Florida.

In the case of Godfrey v. Neumann, 373 So.2d 920 (Fla. 1979) the Florida Supreme Court stated that the commission of a tort in the State of Florida by a non-resident establishes sufficient minimum contacts with Florida to justify the acquisition of in personam jurisdiction over him.

Even more on point, the case of Silver v. Levinson, 648 So.2d 240 (Fla. 4th DCA 1994) stated: " . . . slanderous statements made during a telephone call placed to a Florida number were found to provide a sufficient basis for personal jurisdiction over the nonresident caller."

The Silver court went on further to state that physical presence within the state is not a necessary prerequisite.  See Silver at 243.  A professional who deliberately sends defamatory material into this state is not beyond the jurisdiction of Florida, it is an

4

inescapable fact of modern life that a substantial amount of transactions will solely be done by wire communications and thereby the absence of physical presence will not defeat personal jurisdiction. Id.

The case most on point is <u>Carida v. Holy Cross Hosp. Inc.</u>, 424 So.2d (Fla. 4th DCA 1982) as that case specifically found that slanderous statements made by a person outside of this state but delivered to a person in this state constitutes sufficient contacts to have jurisdiction in the state of Florida. That is exactly what happened in this case. Thereby the <u>Carida</u> case shows that a motion to dismiss personal jurisdiction and subject matter jurisdiction is not proper if the Defendant alleges defamatory statements were delivered to a resident in the state of Florida.

Finally, the Florida Supreme Court specifically put this issue to rest in <u>Wendt v. Horowitz</u>, 822 So.2d 1252 (Fla. 2002) when it stated: "The conflict issue presented in this case is whether making telephonic, electronic or written communications into this State can constitute "committing a tortious act" within Florida to subject a nonresident defendant to personal jurisdiction under section 48.193(1)(b), Florida Statutes. For the reasons that follow, we hold that "committing a tortious act" within Florida under section 49.193(1)(b) can occur by making telephonic, electronic or written communication in this State, provided that the tort alleged arises from such communications."

Even the Federal Eleventh Circuit has acknowledged that physical presence is not required to obtain personal jurisdiction. <u>Robinson v. Giarmarco & Bill P.C.</u>, 74 F.3d 252 (11thCir. 1996). In <u>Robinson</u> a law firm which provided services outside of the State of Florida had personal jurisdiction asserted over it as its documents were delivered via mail in Florida. Similarly in the present case, Biss delivered his slanderous statements in the

State of Florida over the telephone and hence even though he was not present in Florida, the law does not require such presence to confer jurisdiction.

In fact, Defendant Biss has made multiple telephone calls to the State of Florida (see complaint and affidavits) and he intentionally delivered the slanderous statements over the telephone to a recipient located in the State of Florida. (See complaint and affidavits). Hence, Biss should have reasonably anticipated that he would be pursued in the State of Florida, especially since Defendant Biss is a litigation attorney who would arguably have knowledge of the risks he was taking by making such slanderous and defamatory comments.

Based on the previously discussed case law, the Court is to take the allegations of the Plaintiff as true. The Plaintiff has alleged a cause of action which is recognized under Florida law and therefore it would not be appropriate to have the case dismissed under Federal Rule 12(b)(6). Specifically the Defendant has accused the Plaintiff of committing a crime which is recognized as slander per se. Accusing someone of violating the law or assisting another in violating the law is slander per se in Florida. Spears v. Albertson's, Inc., 848 So.2d 1176 (Fla. 1st DCA 2003); Bass v. Rivera, 826 So.2d 534 (Fla. 2nd DCA 2002); Bobenhausen v. Cassat Ave Mobile Homes, Inc., 344 So.2d 279 (Fla. 1st DCA).

## BACKGROUND OF DEFENDANT BISS AS GROUNDS TO QUESTION THE
## VALIDITY OF HIS AFFIDAVIT IN SUPPORT OF HIS MOTION TO DISMISS

As previously discussed, this Court is supposed to take all allegations of the Plaintiff as true in ruling on the motion to dismiss. The Court is to evaluate the affidavits of the parties and construe all reasonable inferences in favor of the Plaintiff. Alexander Proudfoot v. Thayer, 877 F.2d 912 (11th Cir. 1989). Set forth below are numerous examples of improper conduct of the Defendant in court proceedings and thereby Plaintiff asserts that these examples of conduct can be treated as evidence by this Court to determine that it need not make any inferences in favor of the Defendant since the Defendant has a long history of deceit to the court system.

In a lawsuit in the United States District Court for the Northern District of Illinois titled Ray, et al. v. Citigroup Global Markets, Inc., et al., case number 03C3157, Biss filed suit on behalf of 226 Plaintiffs, many of whom he had never met and who had no idea who Biss was, nor had they ever signed any document hiring Biss as their attorney. Nonetheless, Biss held himself out to the court and a federal judge as an attorney who had received the prior approval of all 226 of his alleged clients prior to filing suit. When, questions arose as to whether Biss had ever obtained authority to file such a suit, Judge Kennelly of the Northern District of Illinois ordered Biss to produce his "clients" since many of them were not complying with discovery and opposing counsel suspected that Biss had filed a fraudulent lawsuit and tried to claim he represented hundreds of people in order to force a settlement.

In fact, Biss was unable to produce any discovery on 59 of his alleged clients, at which time he offered to voluntarily dismiss these non-clients from the case.

Fortunately, the Federal Judge did not simply just accept Biss' voluntary dismissals but instead kept probing into how Biss had filed cases on behalf of so many people and yet failed to produce signed discovery or documents on behalf of those people. Thereafter, the Federal Judge conducted a hearing for Biss to explain himself.

At said hearing, Biss made oral representations to the Federal Judge that he had just spoken to his clients. However, it was later learned that one of Biss' "clients" with whom Biss had claimed to have just spoken with had actually died approximately eight months prior to Biss' filing of the lawsuit. Biss was brazen enough to claim he had spoken to someone who was dead. Consequently, Defendant Biss has shown the ability to go into Federal Court and lie directly to a Federal Judge in open court and hence his affidavit filed in this case and his assertions therein should not be accepted based on his history of misrepresentation.

It is quite clear that Biss lied to Federal Judge Kennelly, and the Judge held a sanctions hearing on the matter. The Judge stated that this was the kind of matter that gets referred to the Bar for investigation. See Transcript of Proceedings Before the Honorable Matthew F. Kennelly, a true and correct copy of which was attached hereto as Exhibit "A".

Indeed, the sanctions hearing included the following exchange:

> THE COURT: And since - - I think it was fairly conspicuously absent from your response - - i did not get a written response on the part of this motion that talks about you filing lawsuits on behalf of people you've never talked to. I want a written response to that. And if I were you, I would consult with a lawyer before I did it. Okay? Because whatever I do to you, I'll do whatever I do to you or not do to you, but, you know, we have this little thing called the Attorney Registration and Disciplinary Commission, and they presumably have to have something similar in - - you're from Virginia, right?

8

MR. BISS: Yes, sir.

THE COURT: Something similar in Virginia, which I will not hesitate to refer the matter to. I want an explanation of why it is, what authority it is you think you have to file a lawsuit on behalf of somebody you've never talked to.

Unfortunately, that is not the only time that Biss has been the focus point of the ire of a Federal Judge. In fact, a Federal Judge in New York has found that Biss committed conduct constituting securities fraud.

This conduct relates to Biss' attempted takeover of a public company known as BrandAid Marketing. In November, 2002, Paul Sloan, an officer of BrandAid Marketing, was contacted by representatives of a company named Cyberian Enterprises, Ltd.(represented by Defendant Biss), doing business as Cyberian Holdings, Ltd. ("Cyberian"), that purportedly had interest in providing investment capital to BrandAid Marketing Corporation ("BrandAid").

Biss was the attorney for Cyberian and dealt with Sloan, who is a resident of the State of Florida, on dozens of occasions. BrandAid and Cyberian entered into a merger agreement (the "Agreement") whereby Cyberian agreed to purchase 23,500,000 shares of BrandAid stock for $0.89 per share, with Biss serving as the escrow agent.

Pursuant to the Agreement, BrandAid sent stock to Biss to be held as the escrow agent to the Agreement. While acting as escrow agent and without any authority to invade his escrow account, Biss decided to vote the escrowed shares and in essence breach his escrow responsibilities. Biss voted to remove Sloan from his position at BrandAid. As outrageous as it sounds, what Biss did was take shares from escrow without paying for them and vote them to remove Sloan from office since Biss hated

9

Sloan so much. This matter eventually was litigated and went to trial before a Federal Judge in New York.

In the case of <u>BrandAid Marketing Corporation v. Biss and Cyberian Enterprises, LTD.</u>, in the United States District Court for the Southern District of New York, Case No. 03 Civ. 5088 (WHP). United States District Judge William H. Pauley III issued a scathing opinion regarding Biss' conduct indicating that Biss had violated federal securities laws. In Judge Pauley's Opinion and Order dated August 31, 2005, Judge Pauley found that Biss lied about his having monies on account which would have permitted him to vote the escrowed shares and break escrow. The Judge stated "Indeed, under questioning by this Court, Biss offered contradictory and 'Alice in Wonderland' testimony to explain away Cyberian's assurance that it had the necessary funds..." Opinion and Order at p. 3. (See Exhibit "B"). In essence Biss claimed he had confirmed that $21 million in funds was available from Cyberian, when in fact the Court found that to be untrue.

Judge Pauley also stated that: "this Court finds that when Biss forwarded Cyberian's letter to BrandAid, he was facilitating Cyberian's deception, or consciously avoiding the truth." <u>Id.</u> at p. 4. In essence, Biss was facilitating securities fraud as a co-conspirator because he knew that his client, Cyberian did not have the money to allow him to break escrow.

In further Discussing the Agreement and Biss' role as escrow agent thereto, Judge Pauley stated that: "On December 9, 2002, BrandAid forwarded a certificate for 23,500,000 shares of its common stock to Biss, to hold in escrow until noon on December 16, 2002, when Cyberian was to pay $21 million to BrandAid...Although Biss never

10

received the $21 million from Cyberian, he did not return the share certificate to BrandAid." Id. at p. 7.

Judge Pauley further stated that: "Biss' statement that he had 'received notification that...money had been wired to [his] account' [was] false." Id. at p. 9.

Judge Pauley further stated that: "Although Biss was the architect of the 'merger,' he disclaimed any responsibility at trial and asserted that he 'had no clue' what 'assets were going to be tendered' by Cyberian. As a securities lawyer intricately involved in Cyberian's dealings with BrandAid, Biss' testimony is not credible." Id. at 11 (citations omitted).

Judge Pauley also found that: "For their part, Biss and Cyberian concocted a scheme to take over BrandAid without any investment...As part of that scheme, Biss attempted to vote escrowed shares that Cyberian did not own...any ruling in favor of defendants would reward them for their misdeeds." Id. at 16. The Judge found that Biss had violated the law and acted improperly and Biss again gloats on this conduct as further grounds to intimidate.

Hence, another example of Biss' misdeeds show that he testified falsely in another Federal Court proceeding and yet again another Federal judge issued a scathing opinion of Biss' conduct thus showing that the affidavit filed in this case should be given no weight.

Furthermore, attached hereto as Exhibit "C" are affidavits of persons showing that lawsuits were filed on their behalf by Steven Biss, yet they never authorized, met him or approved of his actions. Hence, the fact that Defendant Biss would make court filings on behalf of others he does not represent is further evidence of his lack of respect for the

court system and grounds for this court to deny the applicability and validity of Mr. Biss' affidavit in this case.

Next, Mr. Biss attempts to defeat jurisdiction by claiming the telephone calls referenced in the lawsuit were never made.  Even though the prior discussions of his conduct should be enough to see that Mr. Biss' affidavit is fraudulent, one need look no further than Mr. Biss' testimony in another proceeding to see that he continually changes his story about all aspects of his life (including his phone records) and thereby none of his testimony can be accepted as true.  Attached hereto as Exhibit "D" is a copy of a transcript from a deposition given by Biss wherein he disclaims that he has any phone number in his name/law firm name and that he cannot even re-call who his cell phone carrier is, yet, in this case he miraculously remembers who his cell phone carrier is and now tries to use those records to claim he never made any of the phone calls alleged in the lawsuit.  Therefore, the mere production of his cell phone records means nothing since Biss has acknowledged that he operated a busy law office and did not have a phone registered in his personal or office name and thereby there is no way to track any of the phone calls this Defendant has been making.  Now, he miraculously produces cell phone records to mislead the court into believing that those records would prove his innocence when it has never been alleged that he made his phone calls from the cell phone.  Hence, his cell phone records are completely irrelevant.

Attached as Exhibit "E" are documents signed by multiple persons who are residents and citizens of the State of Florida and which appointed Biss to be their attorney. These documents are important because in his affidavit, Biss claims that he has no ties to the State of Florida, yet miraculously there are multiple people in the State of

Florida who have appointed him to act on their behalf as their attorney. Therefore, here is more proof that Biss' affidavit has no value.

Attached as Exhibit "F" is the affidavit of Paul Sloan, who can attest to the fact that he literally had dozens of phone calls and communications with Defendant Biss relating to business dealings, all taking place in the State of Florida. Thus, this affidavit again shows that Biss affidavit should be denied any validity.

Attached as Exhibit "G" is the affidavit of David Feingold, Esq. This affidavit certifies the validity of all of the matters asserted in the lawsuit and thereby, taken as true, meets the burden to deny the Defendant's motion to dismiss.

Finally, attached as Exhibit "H" is the affidavit of Sean Zausner which confirms the tortious and slanderous conduct of Defendant Biss and again meets the burden necessary to confer jurisdiction in the State of Florida.

Wherefore, it is respectfully requested that this Court deny the Defendant's Motion To Dismiss.

David J. Feingold, Esq.
Feingold & Kam, LLC.
3300 PGA Blvd.
Suite 410
Palm Beach Gardens, Fl 33410
Phone 561-630-6727
Fax 561-630-8936

Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been sent to Steven Biss, Esq. via fax 312-372-9818 this 1st day of __March__, 2006.

David J. Feingold, Esq.

13

# EXHIBIT

# A

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   SHERWIN I. RAY, et al.,      )    Docket No. 03 C 3157
                                  )
 4              Plaintiffs,       )    Chicago, Illinois
                                  )    Thursday, October 28, 2004
 5                                )    9:30 o'clock a.m.
                                  )
 6          v.                    )
                                  )
 7   CITIGROUP GLOBAL MARKETS,    )
     INC., et al.,                )
 8                                )
                Defendants.  )

 9                   TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY

10   APPEARANCES:

11   For the Plaintiffs:         LAW OFFICE OF STEVEN S. BISS
12                               (1711 East Main Street,
                                  2nd Floor,
13                                Richmond, VA  23219) by
                                  MR. STEVEN S. BISS
14
     For the Defendants:         SIDLEY, AUSTIN, BROWN & WOOD LLP
15                               (Bank One Plaza,
                                  10 South Dearborn Street,
16                                Chicago, IL  60603) by
                                  MS. ELLEN S. ROBBINS
17
                                  SIDLEY, AUSTIN, BROWN & WOOD LLP
18                               (787 Seventh Avenue,
                                  New York, NY  10019) by
19                                MR. DANIEL A. GOLDSCHMIDT

20   Court Reporter:             Mary T. Lindbloom
                                  211 South Court Street
21                                Rockford, Illinois  61101
                                  (815) 987-4486
22

23

24

25
```

8

1      THE COURT:  I'm not persuaded of that.  But, anyway,

2  go ahead.

3      MR. BISS:  Judge, with regard to these missing

4  documents, these missing documents have been produced by me

5  immediately upon receipt.

6      THE COURT:  I know, and your answer is that nobody has

7  asked to redo a deposition.  I understand that.  Okay.  Tell me

8  something that you haven't told me before.  That's what I asked

9  you to do.  Anything new that you haven't told me before.

10      MR. BISS:  Judge, I think I've put everything that --

11      THE COURT:  Fine.  Then explain to me this.  We've got

12  four or five people in here who have signed sworn declarations

13  saying they don't know you from the man in the moon and they've

14  never talked to any of the lawyers for the plaintiffs in this

15  case.  These are people who were named plaintiffs in the

16  lawsuit at the beginning.  How is this possible?

17      MR. BISS:  When I took this case, it was represented

18  to me -- I talked to as many people as I could.  When I took

19  this case, it was represented to me by Mel Stewart that these

20  plaintiffs were willing to join and wanted to join and would

21  participate.

22      THE COURT:  Well, with all due respect, Mr. Biss,

23  talking to a person who has a financial interest in the outcome

24  of the litigation, namely, Mr. Stewart, in the outcome of this

25  and related litigation, in my estimation is not, as Rule 11(b)

9

1    of the Federal Rules of Civil Procedure requires, inquiry

2    reasonable under the circumstances.  You file a suit on behalf

3    of somebody you've never talked to?  I mean, that's astounding.

4    That's astounding.  I mean, I've never heard of that happening

5    in my life.  Have you?

6           MR. BISS:  When I filed it, I had no idea that --

7           THE COURT:  Do you do this all the time?

8           MR. BISS:  No, sir.

9           THE COURT:  Is this something you've done before?

10          MR. BISS:  No, it's not, your Honor.  When I found out

11   that they were adverse --

12          THE COURT:  Well, here's the deal.  No.  I'm done

13   here.  Here's the deal.  You know, you filed this lawsuit with

14   228 plaintiffs or whatever it is.  Presumably you had a reason

15   for doing it that way.  If you file it as a class action,

16   there's all these other requirements, and presumably you filed

17   it as an individual plaintiff case because you thought it

18   strategically -- you did not have to do that.  Okay?  That's

19   fine.  But you can't treat it as a class action.  You represent

20   each and every one of these people.  You are their lawyer.  You

21   can't delegate to people who are not affiliated with you, who

22   have a financial interest in the outcome of the overall

23   litigation, you can't delegate your legal responsibilities.

24          I mean, you are -- you know, if you can imagine a

25   baseball field.  You've got these chalk lines going down to the

11

1    Stewart, Borenstein, whoever they are -- you, Steven Biss, are

2    going to provide me with a sworn affidavit which verifies that

3    you have had a personal conversation with each one of these

4    people and have advised them completely as to what their

5    obligations are under the discovery requests that have been

6    filed and the orders that I've entered, and that's to also be

7    done by that same date on November, the 22nd of November.

8         And since -- I think it was fairly conspicuously

9    absent from your response -- I did not get a written response

10   on the part of this motion that talks about you filing lawsuits

11   on behalf of people you've never talked to, I want a written

12   response to that.  And if I were you, I would consult with a

13   lawyer before I did it.  Okay?  Because whatever I do to you,

14   I'll do whatever I do to you or not do to you, but, you know,

15   we have this little thing called the Attorney Registration and

16   Disciplinary Commission, and they presumably have to have

17   something similar in -- you're from Virginia, right?

18        MR. BISS:  Yes, sir.

19        THE COURT:  Something similar in Virginia, which I

20   will not hesitate to refer the matter to.  I want an

21   explanation of why it is, what authority it is you think you

22   have to file a lawsuit on behalf of somebody you've never

23   talked to.  I want that by ten days from now.  That is the 10th

24   of November.

25        MR. BISS:  Your Honor, the signed verifications, is

# EXHIBIT

# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
BRANDAID MARKETING CORPORATION.,           03 Civ. 5088 (WHP)
                                                    :
            Plaintiff,                     OPINION AND ORDER
                                                    :
            -against-
                                                    :
STEVEN S. BISS and
CYBERIAN ENTERPRISES, LTD.,                         :

            Defendants.                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
STEVEN S. BISS and
CYBERIAN ENTERPRISES, LTD.,                         :

            Third-Party Plaintiffs,                 :

            -against-                               :

PETER MARKUS and PAUL SLOAN,                        :

            Third-Party Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

         This action arises out of an alleged sale of the stock of the plaintiff BrandAid

Marketing Corporation ("BrandAid") to defendant Cyberian Enterprises, Ltd. ("Cyberian"). This

Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. This Court makes the following

findings of fact and conclusions of law. As the finder of fact, this Court limits its discussion to

the testimony and exhibits that it credits. That task is particularly daunting here because each

party deceived the other in their dealings, and that modus operandi also permeated the trial.

<u>FINDINGS OF FACT</u>

1.  The Parties

     At the time this action commenced, BrandAid was a publicly-traded corporation, organized under the laws of Delaware and licensed to transact business in New York. BrandAid's principal office was in Manhattan (Joint Pre-Trial Order, dated Aug. 10, 2004 ("JPTO") ¶ 7.1; Amended Complaint, dated Oct. 14, 2003 ("Am. Compl.") ¶ 1), and its business was in-store advertising using "supercards in displays mounted in supermarkets" (JPTO ¶ 7.6).

     Cyberian is a Hong Kong Company that transacts business in the United States. (JPTO ¶ 7.3.) Defendant Steven S. Biss is a Virginia attorney, who represented Cyberian in its dealings with BrandAid. (JPTO ¶ 7.2; Answer to Amended Complaint by Steven Biss and Cyberian, dated Oct. 22, 2003 ("Ans.") ¶ 10.)

     Peter Markus, a Canadian citizen and resident of Connecticut, worked for Corporate Services Group, LLC ("CSG"), a Connecticut corporation that prepares filings for public companies and provides business-consulting services. (Direct Testimony of Peter Markus, dated July 20, 2004 ("Markus Direct") ¶¶ 1-3.) CSG negotiated contracts for BrandAid. (Markus Direct ¶ 15.) Markus also worked in some capacity at the Law Offices of Charles C. Khym in Flushing, New York. (Markus Direct ¶ 3.) At all relevant times, Markus acted as BrandAid's business consultant—not its attorney. (Plaintiff's Exhibit ("PX") III-12,[1] III-14 at 000184 ("Mr. Markus is not the companies' [sic] counsel.").)

---

[1]  Plaintiff submitted exhibits in six separate binders, with each binder having identical exhibit numbers. Thus, to facilitate discussion, this Court refers to each exhibit by including the binder number before the exhibit number. Thus, for example, Exhibit No. 2 from the second binder is denoted as PX II-2. Also, because the majority of exhibits are not bates stamped, this Court provides the exact page numbers of the relevant portions of the exhibits only where it is readily available.

BrandAid's Chairman, Chief Operating Officer and Secretary was Paul Sloan. (Direct Testimony of Paul A. Sloan, dated July 20, 2004 ("Sloan Direct") ¶ 4.)

II.  Chronology of the Parties' Dealings

    A.  The Parties' Initial Contact

        On September 30, 2002, BrandAid authorized the issuance of 80,000,000 common shares with a par value of $0.001, and actually issued 7,142,190 shares to the public. (PX V-2 at 4.)  In November 2002, Cyberian, through its authorized agent, Steven Massey, contacted BrandAid to express interest in investing in the company.  (JPTO ¶ 7.8; Sloan Direct ¶¶ 94-97.)  Cyberian sought to purchase 23,500,000 BrandAid shares for $21 million.  (PX II-4.)

        At that time, Cyberian assured BrandAid that it had cash available for its investment: "[t]he source of cash is from investments and is currently placed in New York at one of the largest USA Banks."  (PX II-4; Defendants' Exhibit ("DX") 8.)  However, this assurance was false because Cyberian "didn't have the cash in New York."  (Trial Transcript ("Tr.") at 292; see also Tr. at 20-21, 190-91, 316; PX IV-5; Direct Testimony of Steven Massey ("Massey Direct")² at 5-6.)  Indeed, under questioning by this Court, Biss offered contradictory and "Alice in Wonderland" testimony to explain away Cyberian's assurance that it had the necessary funds:

            The Court: . . . [B]ack in November of 2002, you passed on
            representations to BrandAid that Cyberian had $21 million
            essentially on deposit at a US financial institution, right?

---

² Defendants submitted the direct testimony of their witnesses as one comprehensive document, entitled Direct Testimony of Defendants' Witness, dated July 22, 2004.  When citing to the direct testimony of these witnesses, this Court refers to the pagination in that document.  Further, because Massey did not avail himself to cross-examination, his direct testimony is only admissible as an admission against interest.

The Witness: The letter I sent to them was Cyberian's letter.
Cyberian said they had investments placed with a bank in New
York.

* * *

The Court: . . . [The letter] says the source of cash is from
investments and is currently placed in New York at one of the
largest USA banks. So the source is cash, and it is in New York at
a large US financial institution. . . .

The Witness: Judge, I never interpreted that letter to say there was
cash in a bank. I interpreted it to say that there was cash from
investments that were placed in a bank.

* * *

The Court: Given all the things that happened in this case in these
negotiations, and all the e-mail traffic and all of the consternation,
did you ever speak to your clients about this $21 million?

The Witness: Yes, and it was disclosed to Mr. Sloan and Mr.
Markus that there was no cash in any bank. I never made any
representation to them that there was 21 million anywhere, ever. I
just never said that to them, and neither did Mr. Massey. It was
disclosed to them all along. They knew from the beginning of this
until they signed the addendum that there was not 21 million.

The Court: But if there was no 21 million in cash, why would you
forward a letter sent to you to them saying that it's currently placed
in New York at one of the largest USA banks?

The Witness: They asked for a request for information asking
Cyberian for the source of its funds. I forwarded that request to
Cyberian and forwarded Cyberian's response to Mr. Markus.

(Tr. at 280-82.) Thus, this Court finds that when Biss forwarded Cyberian's letter to BrandAid,

he was facilitating Cyberian's deception, or consciously avoiding the truth.

As part of the contract negotiations, Cyberian also assured BrandAid's

representatives that it did not intend to make any changes to the BrandAid board or interfere with

its day-to-day operations:

> In regards to the current officers and directors of Brandaid there are no changes planned. We have faith in the current management and believe that an infusion have [sic] capital will assist them in becoming very successful in a shorter time period.
>
> The future of Brandaid is in the hands of its current management. We believe that with their industry knowledge, past experience and sufficient capital they will be successful. . . .
>
> Brandaid's place of business is the decision of current management.
>
> Please understand that we in no way, shape or form want to be involved or interfere with the operations of Brandaid. We believe there is long term value with Brandaid and our intent is to hold the shares to be purchased long term.

(PX 11-4 (internal paragraph numbering omitted); see also Tr. at 140-41.)  As discussed below,

those representations proved false.


B.  The Ratification of the Subscription Agreement

On November 14, 2002, BrandAid and Cyberian ratified a Subscription

Agreement (the "Subscription Agreement"), whereby Cyberian agreed to purchase 23,500,000

shares of BrandAid for $21 million.  (DX 10 at SM02010058; see also JPTO ¶ 7.9.)  A revised

version of the Subscription Agreement noted:

> The closing of the sale of the Shares shall take place within thirty (30) days of the date of acceptance of this Subscription Agreement by the Company. At closing, the Subscriber or assigns shall tender to the Company and/or the [CSG], Peter Markus, Esquire, by bank draft or wire transfer, the total amount of $21,000,000.00 (the "Purchase Amount"). Upon receipt of the Purchase Amount, the Company shall deliver to the Subscriber or assigns original stock certificates evidencing ownership of 23,500,000 Shares of the Company.

(DX 10 at SM02010065; see Sloan Direct ¶ 148.)  In the Subscription Agreement, BrandAid

"represent[ed] and warrant[ed]" the following:

5

(1) The Company is a Delaware corporation, duly organized, licensed and in good standing under the laws of the State of Delaware.

(2) The Company is . . . in good standing [with the Securities and Exchange Commission (SEC)]. . . . The Company and its officers and directors are not defendants or respondent in any action or proceedings which could result in a judgment, award or decision which could materially affect the value of the Company and/or the Shares. The Company and its officers and directors are not the subject of any action or proceeding by . . . the SEC.

\* \* \*

(4) The Company and the persons executing on behalf of the Company have all requisite power and authority to enter into this Subscription Agreement and to perform all of the obligations required to be performed by the Subscription as a seller of the Shares.

(5) All information supplied by the Company to the Subscriber and contained in the Company's public records and listing is true and correct as of the date hereof, and the Company acknowledges that the Subscriber has relied upon the accuracy of such information in deciding to enter into this Subscription Agreement and purchase the Shares. As of the date hereof, the Company knows of no fact or event that would materially affect the value of the Company and/or the Shares.

(DX 10 at SM020100056-57.)

BrandAid's representations were false. BrandAid was not in good standing with the State of Delaware, because its corporate charter had been voided for non-payment of corporate franchise taxes. (DXs 11-13.) Further, BrandAid had materially breached its obligations to vendors, including Safeway, Pathmark, Vectra as well as its previous attorneys, Kleinberg, Kaplan, Wolff & Cohen, P.C. (Tr. at 45; see DXs 26, 30, 33.) None of those adverse events were disclosed to Cyberian. (Tr. at 31; see Tr. at 25-27.) After the subscription agreement was signed, BrandAid's contract breaches with its vendors not only materially

affected the value of the Company but forced it to close down.  (JPTO ¶ 7.38; <u>see</u> Tr. at 25; DXs 18-28, 36-37.)

Additionally, BrandAid failed to disclose certain third-party transactions to Cyberian that culminated in lawsuits.  (Tr. at 52; JPTO ¶ 7.13; DX 32; <u>see also</u> DX 31.)  Finally, BrandAid failed to disclose that the SEC initiated an inquiry into Sloan's activities.  (Tr. at 47; DX 29.)  Thus, this Court finds that BrandAid attempted to secure the $21 million investment from Cyberian by withholding information about its precarious existence.

On December 9, 2002, BrandAid forwarded a certificate for 23,500,000 shares of its common stock to Biss, to hold in escrow until noon on December 16, 2002, when Cyberian was to pay $21 million to BrandAid.  (PX 11-8 at 2; JPTO ¶ 7.15.)  The BrandAid shares were to be released to Cyberian only after Biss received $21 million in cleared funds.  (PX 11-8 at 2.)  "In the event that the said funds [were] not received . . . . the share certificate [was to be] returned via overnight priority delivery to BrandAid Marketing Corporation."  (PX 11-8 at 2.)  <u>Although Biss never received the $21 million from Cyberian, he did not return the share certificate to BrandAid.</u>

### C.  The Parties' Failure to Complete the Deal

On December 13, 2002, Biss informed BrandAid that Cyberian needed a 30-day extension to arrange for funding.  (JPTO ¶ 7.16.a; Tr. at 145.)  The parties agreed to the extension.  (Sloan Direct ¶ 154.)  On December 20, 2002, Biss relayed to Markus that Cyberian was "in the batter's box" and "hoped" to close before December 25, 2002.  (PX 11-13 at 000058.)  On December 27, 2002, Biss informed Markus:  "I have emails in to Steve Massey, and hope to advise of the closing date early next week."  (PX 11-14 at 000059.)  On January 2, 2003, Biss

wrote to Markus that Cyberian was "moving towards the closing" (PX II-15 at 000058) and expected to close the deal on January 30, 2003 (Tr. at 278). While the parties continued to discuss the mechanics for closing the deal (PXs II-18, II-19, II-20, II-21, II-22, II-23, II-24, II-25; see JPTO ¶ 7.16.b), Sloan grew inpatient with Cyberian's continued failure to make the promised investment (PX III-1). Because Cyberian was unable to close on January 30, 2003 (Tr. at 278), BrandAid obtained $225,000 in bridge financing from Mel Stewart and Howard Borenstein (Tr. at 189, 276; JPTO ¶ 7.17.b; see Sloan Direct ¶¶ 243-44; PX III-1).

      Anxious about Cyberian's inability to close the deal, Sloan informed Biss, on February 7, 2003, that he could "no longer depend on [Biss'] clients [sic] statements directly or indirectly and will seek other sources of funding." (PX III-4 at 000154; see PX III-2 at 000141; PX III-4 at 000159 ("The current crisis that BrandAid faces is directly related to your client's failure to honor his [sic] contractual commitment."); DX 37.) In response, Biss reported that Massey was in possession of "signed written contracts" that would help BrandAid with its finances. (PX III-4 at 000152; see also PXs III-2 at 000133 ("I just received notification that the money has been wired to my account."), II-20 at 000078.) At trial, Cyberian never offered any "signed written contracts." This Court finds that Cyberian's repeated assurances were deceptive.

      The following day, on February 8, 2003, Biss forwarded an amended subscription agreement to BrandAid. (JPTO ¶ 7.18; see also PX III-5; DX 37.) BrandAid signed the Amended Subscription Agreement on March 24, 2003. (PX III-8; JPTO ¶ 7.19; Sloan Direct ¶ 307.) The Amended Subscription Agreement substituted a thirty-six month installment payment regime in place of one lump sum payment. (PX III-8; Sloan Direct ¶ 308.) It also extended the closing date to May 23, 2003. (PX III-8; Sloan Direct ¶ 308.)

Just two weeks later, still lacking the necessary funds, Cyberian contacted BrandAid with a yet another proposal. (PX III-12; Tr. at 315-16.) In particular, on April 1, 2003, Massey contacted Sloan to discuss restructuring the parties' transaction. (JPTO ¶ 7.20; Sloan Direct ¶ 311.) Sloan referred Massey to Markus for further discussions. (JPTO ¶ 7.20; Sloan Direct ¶ 312.)

Massey and another businessman, Lawrence Artz, met with Markus. (JPTO ¶ 7.21; Sloan Direct ¶ 316; Markus Direct ¶ 41.) Artz was introduced as "the power behind Cyberian," who acted "for a very rich Chinese family." (Markus Direct ¶ 42; see also PXs V-12, V-13.) At that meeting, Massey acknowledged that Cyberian did not have the funds to "close the transaction," and therefore Artz's assistance was necessary. (Markus Direct ¶ 42.) This acknowledgement, which defendants do not contradict, confirms that Cyberian's earlier statements regarding "signed written contracts" (PX III-4 at 000152; see also PXs II-12, II-13, II-15, II-18, II-20 at 000078, II-23, II-25; Sloan Direct ¶ 232) and Biss' statement that he had "received notification that . . . money has been wired to [his] account" (PX III-2 at 000133) were false.

Artz proposed, inter alia, a cashless exchange of Chinese real estate to BrandAid for the BrandAid shares (the "Artz Proposal"). (See JPTO ¶ 7.21; Markus Direct ¶ 42; see also PX III-13.) The Artz Proposal further involved merging BrandAid into another company and listing the shares of the new company on the American Stock Exchange. (See JPTO ¶ 7.21; Markus Direct ¶ 42; see also PX III-13.) Specifically, Artz's proposal for BrandAid included "acquir[ing] an existing public company which has the requisite number of shareholders, and apply[ing] for listing on the American Stock Exchange," and spinning off BrandAid's existing

9

advertising specialty business. (PX V-13.)  Sloan rejected the Artz Proposal. (PX III-14; Sloan Direct ¶¶ 318-30.)

On April 16, 2003, Biss notified Sloan that Cyberian intended to vote the escrowed shares in favor of the Artz Proposal even though Cyberian had not paid for those shares:

> I represent Cyberian Enterprises Ltd. in connection with its rights under the Subscription Agreement, Addendum, and 23,500,000 Shares of the common stock of Brandaid Marketing Corporation ("Brandaid" of [sic] the "Company").
>
> This letter shall serve as Cyberian's written consent to the proposal/plan for simultaneous merger and application to the American Stock Exchange (the "Proposal") presented to Brandaid by [Artz]. As Chairman of Brandaid, you are hereby directed by Cyberian to proceed immediately to execute any and all letters of intent or other agreements necessary to effectuate the Proposal.

(PX III-15; see also Tr. at 315-16; Sloan Direct ¶ 334.)  Biss demanded that Sloan proceed with the Artz Proposal or call a shareholder meeting so that Cyberian could vote the escrowed shares. (JPTO ¶ 7.22; PX III-15; Sloan Direct ¶ 334.)  Biss warned that a failure to call the shareholder meeting "would be a substantial breach of [Sloan's] fiduciary duties to [Cyberian] and the other shareholders of Brandaid" and noted that Cyberian had already filed a lawsuit in the United States District Court for the Eastern District of Virginia. (PXs III-15, III-16; Sloan Direct ¶ 336-37; Massey Direct at 8 ("On or about April 15, 2003, I instructed Mr. Biss to take legal action against Brandaid for a declaration that Cyberian had a right to vote its shares, even though the shares had not yet been paid for.").)  On May 5, 2003, Biss followed up with an email to Markus in which he reiterated Cyberian's support for the Artz Proposal. (PX III-17.)

In early May 2003, Biss launched a cashless takeover of BrandAid.  He prepared a Letter of Intent for a joint merger and acquisition agreement of BrandAid with Standard

Financial Group ("SFG") and certain other third parties. (PX V-16.) The Letter of Intent noted that BrandAid's new directors would include Artz and not Sloan. (JPTO ¶ 7.26; Tr. at 204, 306-07, 323; PX V-16.) The Letter of Intent's central provision stated: "[i]n exchange for 23,500,000 shares of common stock, Cyberian shall tender forthwith <u>certain of its assets</u>, whose value is not less than $21,000,000 USD." (PX V-16 (emphasis added).)

        There is no evidence that Cyberian exchanged assets worth $21 million for the BrandAid shares. Although Biss was the architect of the "merger," he disclaimed any responsibility at trial and asserted that he "had no clue" what "assets were going to be tendered" by Cyberian. (Tr. at 318.) As a securities lawyer intricately involved in Cyberian's dealings with BrandAid, Biss' testimony is not credible. (<u>See</u> Tr. at 237-38, 244-46, 324-26.) Indeed, Biss testified: "I approved the contents of the letter of intent. I thought it was a good idea and the shareholders [of Cyberian] told me they thought it was a good idea to sign this so we could consider the proposal and consider what they were doing in the merger." (Tr. at 323-24.)

        Purporting to act for a majority of BrandAid shareholders, Biss informed Sloan on May 23rd that the then-existing officers and directors of BrandAid were terminated and a new slate of directors had been appointed in their place. (PX III-20; <u>see also</u> PX III-21; JPTO ¶¶ 7.27-7.28.) Biss repeated that representation to the SEC. (PX III-19 at 000175.) However, his letter to the SEC was silent regarding the reasons for the change in BrandAid's board membership. The new board consisted of William C. Needham, its Chairman, and Benjamin Wang, Peter Poehna, Hill and Artz. (PX III-20; <u>see also</u> PX III-21; JPTO ¶ 7.36.) This board was installed to approve the SFG proposal after BrandAid's original board declined to act. (Tr. at 322-23.)

Simultaneously, Cyberian and BrandAid, through its new Chairman Needham, attempted to consummate the land-for-shares swap. (PX III-24; JPTO ¶ 7.29.) That cashless stock purchase agreement was filed with the SEC. (JPTO ¶ 7.29.) The parties did not present any credible evidence to establish that the land exchanged for the shares was worth $21 million.

On June 3, 2003, Sloan, purporting to act for BrandAid, demanded that Biss cease and desist from taking further action. (JPTO ¶ 7.30.) The next day, Markus asked Biss to return the BrandAid shares in escrow. (JPTO ¶ 7.31.) Refusing to return the shares, Biss asserted that his actions complied with Delaware law and SEC rules. (JPTO ¶ 7.32.)

On June 13 and 16, 2003, Biss filed various forms with the SEC. (JPTO ¶¶ 7.36-6.37.) On June 17, Sloan filed a Form 8-K, reporting that BrandAid had lost its funding and was "temporarily ceasing operations" because of Biss' activities. (JPTO ¶ 7.38.)

## CONCLUSIONS OF LAW

BrandAid asserts three claims against Cyberian: (1) breach of contract; (2) violation of Section 10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) fraud.[1] In turn, Cyberian asserts counterclaims and third-party claims for (1) fraud against Sloan and BrandAid; (2) tortious interference with contract against Markus; and (3) breach of an implied covenant of good faith and fair dealing against Sloan and BrandAid.

As discussed below, this Court concludes that all of the parties' claims are barred by the doctrine of in pari delicto. See Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1089-91

---

[1] Plaintiff initially asserted claims for injurious falsehood and tortious interference with shareholders, but has withdrawn those claims. (See Plaintiff's Proposed Findings of Fact and Conclusions of Law, dated Aug. 23, 2004 ("Pl. Mem.") at 20; Proposed Finding of Fact ¶ 46; JPTO ¶ 4.)

(2d Cir. 1997) (holding that the in pari delicto defense bars a plaintiff's claims for violation of the Commodities Exchange Act where the plaintiff participated in the scheme to manipulate the commodities market); Ross v. Bolton, 904 F.2d 819, 824-26 (2d Cir. 1990) (holding that the in pari delicto defense may bar a plaintiff's Rule 10b-5 claims where he knowingly engaged in an illegal trading scheme).

1.   The In Pari Delicto Doctrine

The in pari delicto doctrine states that "if the parties are in pari delicto—equal fault—then recovery will be denied." Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution 564 (2d ed. 1993); see also Pinter v. Dahl, 486 U.S. 622, 632 (1988); Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985) ("The common-law defense at issue in this case derives from the Latin, in pari delicto potior est conditio defendentis: 'In a case of equal or mutual fault the position of the defending party is the better one.'" (quoting Black's Law Dictionary 711 (5th ed. 1979) (internal alternations omitted))); Peltz, 115 F.3d at 1090 ("[W]hen there is mutual wrongdoing, the law favors the defending party."). That is, "the plaintiff should not . . . recover, and the parties should be left where they are." Ross, 904 F.2d at 824. The in pari delicto doctrine "is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." Bateman Eichler, 472 U.S. at 306; see also Ross, 904 F.2d at 824-26 (finding the in pari delicto doctrine applicable where plaintiff knowingly engaged in an illegal trading scheme); Abright v. Shapiro, 214 A.D.2d 496, 496-97, 626 N.Y.S.2d 73, 73-74 (1st Dep't 1995). In the context of this action, Lord Mansfield's observation is particularly apt:

> The objection, that a contract is immoral or illegal as between
> plaintiff and defendant, sounds at all times very ill in the mouth of
> the defendant. It is not for his sake, however, that the objection is
> ever allowed. . . . The principle of public policy is this: ex dolo
> malo non oritur actio [out of fraud no action arises]. . . . It is upon
> that ground the Court goes; not for the sake of the defendant, but
> because they will not lend their aid to such a plaintiff.

Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (K.B. 1775) (quoted in Bateman Eichler, 472 U.S.

at 306 n.12); see also Austin's Adm'x v. Winston's Ex'x, 11 Va. 33, 47 (1806) ("He who comes

here for relief must draw his justice from pure fountains"); Fid. Bank, Nat'l Ass'n v. Avrutick,

740 F. Supp. 222, 232 n.9 (S.D.N.Y. 1990); Abright, 626 N.Y.S.2d at 73-74; Ford v. Henry, 155

Misc. 2d 192, 193-94, 598 N.Y.S.2d 660, 661-62 (App. Term. 1993).  Under slightly different

facts, the New York Court of Appeals explained the principle as follows:

> It is the settled law of this State (and probably of every other State)
> that a party to an illegal contract cannot ask a court of law to help
> him carry out his illegal object, nor can such a person plead or
> prove in any court a case in which he, as a basis for his claim, must
> show forth his illegal purpose.  For no court should be required to
> serve as paymaster of the wages of crime, or referee between
> thieves.  Therefore, the law will not extend its aid to either of the
> parties or listen to their complaints against each other, but will
> leave them where their own acts have placed them.

Stone v. Freeman, 298 N.Y. 268, 271 (1948).

"[A] private action for damages . . . may be barred on the grounds of the plaintiff's

own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least

substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit

would not significantly interfere with the effective enforcement of the securities laws and

protection of the investing public." Bateman Eichler, 472 U.S. at 310-11.  The defense applies

where the plaintiff participates in "the same sort of wrongdoing" as the defendant, Bateman

Eichler, 472 U.S. at 307, and the degrees of fault are essentially indistinguishable, Peltz, 115

14

F.3d at 1090 (citing <u>Pinter</u>, 486 U.S. at 636).  Finally, it is not necessary that the plaintiff and the defendant have participated in the same illegal acts, but that the two parties' wrongdoings stem from the same subject of the litigation.  See <u>Pinter</u>, 486 U.S. at 632; <u>Peltz</u>, 115 F.3d at 1090-91; <u>UCAR Int'l Inc. v. Union Carbide Corp.</u>, No. 00 Civ. 1338 (GBD), 2004 WL 137073, at *11 (S.D.N.Y. Jan. 26, 2004) ("Even if the wrongdoing is not of an 'identical nature,' it does not destroy the defense."); <u>see also</u> <u>Bateman Eichler</u>, 472 U.S. at 310-11 (noting that the plaintiff must bear substantially equal responsibility "for the violations he seeks to redress").

II.   <u>Application of the In Pari Delicto Doctrine</u>

   Both plaintiff and defendants seek to hold the other side liable for the transaction's failure and their resulting losses.  Thus, both plaintiff's and defendants' actions satisfy the first prong of the <u>Bateman Eichler</u> test in that, as a direct result of their own conduct, they bear at least substantially equal responsibility for the violations each seeks to redress.  As noted above, BrandAid, through Sloan, repeatedly made false statements and omitted material facts in its representations to Cyberian in order to obtain an investment of $21 million.  For example, while BrandAid's corporate charter was revoked in March 2002 and remained void at least until July 9, 2003 (DXs 11-13; <u>see also</u> DX 14), BrandAid represented that it was in good-standing in Delaware, its state of incorporation.  Further, BrandAid withheld information about its involvement in legal proceedings and the SEC's investigation of Sloan's activities.  Finally, BrandAid concealed that it was in default of its obligations to almost all of its major vendors.  In fact, those defaults led to the company's closure.  Thus, BrandAid tried to deceive Cyberian into investing in a company that was practically worthless.

   For their part, Biss and Cyberian concocted a scheme to take over BrandAid

without any investment. Cyberian promised BrandAid $21 million when it had no such funds. Cyberian repeatedly made false promises of prompt payment. Cyberian also launched a brazen takeover of BrandAid without tendering the promised funds. As part of that scheme, Biss attempted to vote escrowed shares that Cyberian did not own. Finally, Cyberian and Biss attempted to force BrandAid to accept the Artz Proposal without any due diligence into the value of the assets to be exchanged for BrandAid shares.

This Court also finds that application of the in pari delicto doctrine satisfies the second prong of the Bateman Eichler inquiry. That is, preclusion of plaintiff's and defendants' claims would not interfere with the effective enforcement of the securities laws and protection of the investing public. "Au contraire, allowing [the parties' claims] would significantly interfere with the enforcement of statutes designed to protect the investing public." Peltz, 115 F.3d at 1091. To find for plaintiff, this Court would have to ignore BrandAid's repeated misrepresentations and omissions to Cyberian, the potential investor. Such a finding would sanction the very activities prohibited by the federal securities laws. See Peltz, 115 F.3d at 1091; see also Pinter, 486 U.S. at 637-39. Conversely, any ruling in favor of defendants would reward them for their misdeeds. To avoid such mischief, equity and conscience require this Court to declare "A plague o' both your houses!" W. Shakespeare, Romeo and Juliet, Act. III, scene i, line 90.

# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------X

SHERWIN I. RAY, et al.,

                                Plaintiffs,                    03 CV 3157
                                                               Judge Matthew F. Kennelly
          -against-

CITIGROUP GLOBAL MARKETS, INC.,
F/k/a Salomon Smith Barney, Inc.,
CITIGROUP, INC., and JOHN HENRY SPATZ,

                                Defendants.

-------------------------------------------------------------------X

## DECLARATION OF CAROLYN GLOVER

          Carolyn Glover declares as follows:

1.        I reside at 11807 Rue Beaujon Ct., Tomball, Texas.

2.        I am the founder of the Paul and Carolyn Glover International Foundation (the
"Foundation").

3.        I personally, and the Foundation, previously had securities brokerage accounts
with Millard Stewart a/k/a Mel Stewart at his firm, GunnAllen Financial, Inc., and his former
firm, Birchtree Financial Services, Inc.

4.        On August 23, 2004, I received a telephone call from Nicholas P. Crowell and
Daniel A. Goldschmidt of Sidley Austin Brown & Wood LLP.  They identified themselves as
attorneys who represent Citigroup, Inc., Citigroup Global Markets, Inc. and one of its employees
in connection with the above-captioned lawsuit filed in Illinois.

5.        I told Messrs. Crowell and Goldschmidt that I had no idea I was named as a
plaintiff in the above-captioned lawsuit.

6.        I never authorized Mel Stewart, Steven S. Biss, or Catherine Chapman to file a
lawsuit on my behalf.

7.    In 2002, I filed for arbitration against Mel Stewart, et al., and was represented by my attorneys, Edward A. Mattingly of Mattingly & Schneider, PLLC, 1900 West Loop South, Suite 770, Houston, Texas 77027, 713.621.1711, and John O'Neill of Clements & O'Neill, 18th Floor, Wells Fargo Building, Houston, Texas 77022, 713.654.7600.  My claims involving SmartServ Online, Inc. were included in that arbitration proceeding, which arbitration was resolved by way of settlement with a confidentiality provision on terms that were satisfactory to me in 2003.

8.    I have not spoken to Mr. Stewart since around the time I filed a Statement of Claim against him with the National Association of Securities Dealers, Inc. in September 2002.

9.    I have never heard of or spoken to Steven S. Biss.

10.    I have never heard of or spoken to Catherine Chapman.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on August 31, 2004 in Tomball, Texas.

Carolyn Glover

2

NY1 5589416v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------X

SHERWIN I. RAY, et al.,

                Plaintiffs,                03 CV 3157
                                            Judge Matthew F. Kennelly

        -against-

CITIGROUP GLOBAL MARKETS, INC.,
f/k/a Salomon Smith Barney, Inc.,
CITIGROUP. INC., and JOHN HENRY SPATZ,

                Defendants.

-------------------------------------------------------------X

## DECLARATION OF TERI JONES

Teri Jones declares as follows:

1.      I reside at 11807 Rue Beaujon Ct., Tomball, Texas.

2.      I previously had a securities brokerage account with Millard Stewart a/k/a Mel Stewart at his firm, GunnAllen Financial, Inc., and his former firm, Birchtree Financial Services, Inc.

3.      On August 23, 2004, I received a telephone call from Nicholas P. Crowell and Daniel A. Goldschmidt of Sidley Austin Brown & Wood LLP.  They identified themselves as attorneys who represent Citigroup, Inc., Citigroup Global Markets, Inc. and one of its employees in connection with the above-captioned lawsuit filed in Illinois.

4.      I told Messrs. Crowell and Goldschmidt that I had no idea I was named as a plaintiff in the above-captioned lawsuit.

5.      I never authorized Mel Stewart, Steven S. Biss, or Catherine Chapman to file a lawsuit on my behalf.

6.      In 2002, I filed for arbitration against Mel Stewart, et al., and was represented by my attorneys, Edward A. Mattingly of Mattingly & Schneider, PLLC, 1900 West Loop South,

Suite 770, Houston, Texas 77027, 713.621.1711, and John O'Neill of Clements & O'Neill, 18th

Floor, Wells Fargo Building, Houston, Texas 77022, 713.654.7600.  My claims involving

SmartServ Online, Inc. were included in that arbitration proceeding, which arbitration was

resolved by way of settlement with a confidentiality provision on terms that were satisfactory to

me in 2003.

      7.     I have not spoken to Mr. Stewart since around the time I filed a Statement of

Claim against him with the National Association of Securities Dealers, Inc. in September 2002.

      8.     I have never heard of or spoken to Steven S. Biss.

      9.     I have never heard of or spoken to Catherine Chapman.

      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

      Executed on August _31_, 2004 in Tomball, Texas.

                                      Teri Jones

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------------------X

SHERWIN I RAY, et al.,

               Plaintiffs,

    -against-

CITIGROUP GLOBAL MARKETS. INC.,
f/k/a Salomon Smith Barney, Inc.,
CITIGROUP. INC., and JOHN HENRY SPATZ,

               Defendants.

-----------------------------------------------------------------X

03 CV 3157
Judge Matthew F. Kennelly

### DECLARATION OF CHRISTINE NEKEFEROFF

Christine Nekeferoff declares as follows:

1.    I reside at 1111 Abbington Ct., Anchorage, Alaska, 99503.

2.    I previously had a securities brokerage account with Millard Stewart a/k/a Mel Stewart at his firm, GunnAllen Financial, Inc., and his former firm, Birchtree Financial Services, Inc.

3.    I never knew that I was named as a plaintiff in the above-captioned lawsuit.

4.    I never authorized Mel Stewart, Steven S. Biss, or Catherine Chapman to file a lawsuit on my behalf.

5.    In 2002, I filed for arbitration against Mel Stewart, et al., and was represented by my attorneys, Edward A. Mattingly of Mattingly & Schneider, PLLC, 1900 West Loop South, Suite 770 Houston Texas 77027, 713.621.1711, and John O'Neill of Clements & O'Neill, 18th Floor, Wells Fargo Building, Houston, Texas 77022, 713.654.7600.  My claims involving SmartServ Online. Inc. were included in that arbitration proceeding, which arbitration was resolved by way of settlement with a confidentiality provision on terms that were satisfactory to me in 2003.

6.      I have not spoken to Mr. Stewart since around the time I filed a Statement of

Claim against him with the National Association of Securities Dealers, Inc. in September 2002.

7.      I have never heard of or spoken to Steven S. Biss.

8.      I have never heard of or spoken to Catherine Chapman.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

Executed on August ~~, *September* 2004 in Anchorage, Alaska.


_Christine Nekeferoff_
**Christine Nekeferoff**

2

NY1 55894204.1

# EXHIBIT

# D

```
 1                                                              1

 2       UNITED STATES DISTRICT COURT

 3       SOUTHERN DISTRICT OF NEW YORK

 4       - - - - - - - - - - - - - - - - - - - - - - - - - - -X

 5       BRANDAID MARKETING CORPORATION,

 6                                        Plaintiff,

 7           -against-             #03CV5088

 8       STEVEN S. BISS, and

 9       CYBERIAN ENTERPRISES, LTD.,

10                                        Defendants.

11       - - - - - - - - - - - - - - - - - - - - - - - - - - -X

12

13                                   September 14, 2003

14                                   10:30 A.M.

15                                   49 West 33rd Street

16                                   New York, New York

17

18

19                EXAMINATION BEFORE TRIAL of

20       Defendant, STEVEN S. BISS, taken by

21       Plaintiff, pursuant to Notice and Court Order

22       of Justice Pauley, before a Notary Public of

23       the State of New York.

24

25


                 LYNETTE YUEN        (917)  680-0169
```

|   |   |   |   |
|---|---|---|---|
| 1 | | S. Biss | 104 |

2      A     804 334-6319.

3      Q     What carrier do you use for the

4 cell phone?

5      A     I don't know.

6      Q     Do you pay a monthly bill for

7 the carrier?

8      A     Yes.

9         MR. SIEGERT:  I call for the

10         production of the checks --

11      Q     Do you pay by check to the

12 carrier?

13      A     Sometimes, check.

14         MR. SIEGERT:  I call for

15         production of all checks of this

16         witness whereby he paid his cell

17         phone telephone bills, from

18         November of 2002 through the

19         present time.

20      Q     Did you say that you did not

21 know who your cell phone carrier was; is that

22 right?

23      A     No, I don't know.  I don't.

24      Q     What about the telephone that

25 you use to conduct your legal practice,

                              S. Biss                        194

1

2       all documents which representations were made

3       that Mr. Markus was an attorney; is that

4       correct?

5              A       Yes.

6              Q       Incidently, do you have a

7       telephone number that is listed in Richmond,

8       Virginia, for your office?

9              A       I don't know.  My wife set up

10      the phones for me.  I never really paid much

11      attention to it.

12             Q       When was that?

13             A       October 2000, she set it up

14      originally.  She set up two business

15      entities.  I don't really need to be listed.

16      I get enough phone calls as it is.

17             Q       So in answer to my question, do

18      you have a listing as an attorney --

19             A       No.

20             Q       -- in Virginia.

21             A       No.  Personally, no.

22             Q       As an attorney, do you have a

23      telephone listing?

24             A       No.

25             Q       As an attorney anywhere in


                LYNETTE YUEN        (917)  680-0169

S. Biss                                         195

1

2     Virginia.  There is no listing of a law

3     office of Steven S. Biss?

4          A     I don't do any advertising

5     whatsoever.

6          Q     I'm not talking about

7     telephone --

8          A     I'm not listed anywhere.  I'm

9     not listed in the phone book.  I'm not listed

10    anywhere.

11         Q     As an attorney.

12         A     Or otherwise.  If you look for

13    my cell phone, it's not in my name either,

14    it's in my wife's name.  Because she set it

15    up.

16         Q     That's back in 2000?

17         A     Yes.

18         Q     Between 2000 and 2003, did you

19    have any listing for your name as an attorney

20    in the State of Virginia?

21         A     Not to the best of my knowledge,

22    no.

23         Q     Have you ever declared

24    bankruptcy, personal or otherwise?

25         A     No.  I've never been convicted

LYNETTE YUEN          (917)  680-0169

# EXHIBIT

# E

MAY-27 03 19:01  FROM:UPTOWN BODY CTR.     14053306770        TO:954 771    6        PAGE:03

May 27, 2003

Dominic Darpino TTEE Dominic Darpino Revocable Trust DTD 1-14-87
5561 NE 28 Avenue
Fort Lauderdale FL 33308-3443

RE:    Power of Attorney and Revocable Proxy to Vote Shares
       of Brandaid Marketing Corporation

To Whom It May Concern:

I, DOMINIC DARPINO, being the holder(s) of ___11,283__ shares of common
stock, par value $0.001 per share of Brandaid Marketing Corporation ("Registrant"), do
hereby make, constitute and appoint STEVEN S. BISS, Esquire, as my/our true and
lawful agent and attorney-in-fact (hereinafter referred to as "Agent") for me/us and in
my/our name, place and stead to act by proxy, to execute any consent or dissent to
corporate action, and to votes my/our shares at any special meeting of the shareholders of
Brandaid, and to perform all and every act necessary or incidental thereto. I hereby
consent to notice of any action taken by my Agent by mail, facsimile transmission or
regular mail.

This Power of Attorney and Revocable Proxy ("Power") shall remain in full force
and effect until revoked by me in a writing delivered to my Agent. A facsimile copy of
this Power shall be as good and sufficient authority for all purposes as an original.

This Power is not solicited on behalf of the Registrant's board of directors.
This Power is solicited by and on behalf of Steven S. Biss, Esquire.

The matters to be acted upon by Mr. Biss are set forth in the attached written
consent of stockholders in lieu of meeting ("Consent"). This Power confers
discretionary authority upon Mr. Biss to act as your attorney-in-fact. Mr. Biss
intends to use the Power to execute and deliver the Consent and take the action
specified therein on behalf of the stockholders in lieu of a meeting. You may
withhold authority to vote for any nominee to the New Board of Directors by lining
through the name of such nominee.

I acknowledge receipt of a definitive proxy statement concurrently with this
Power.

Given by me on May 27, 2003.

By. _Dominic Darpino_ TTEE

DOMINIC DARPINO, TRUSTEE
(Print Name)

May 28, 2003

Emery Metzler
2506 Country Road 305
Bunnell FL 32110

RE:   Power of Attorney and Revocable Proxy o Vote Shares
      of Brandaid Marketing Corporation

To Whom It May Concern:

I, Emery Metzler, being the holder(s) of 92' 1 shares of common stock, par value
$0.001 per share of Brandaid Marketing Corporatio 1 ("Registrant"), do hereby make,
constitute and appoint STEVEN S. BISS, Esquire, s my/our true and lawful agent and
attorney-in-fact (hereinafter referred to as "Agent", for me/us and in my/our name, place
and stead to act by proxy, to execute any consent o  dissent to corporate action, and to
votes my/our shares at any special meeting of the s areholders of Brandaid, and to
perform all and every act necessary or incidental th reto. I hereby consent to notice of
any action taken by my Agent by email, facsimile t ansmission or regular mail.

This Power of Attorney and Revocable Pro y ("Power") shall remain in full force
and effect until revoked by me in a writing deliver d to my Agent. A facsimile copy of
this Power shall be as good and sufficient authorit for all purposes as an original.

This Power is not solicited on behalf of th e Registrant's board of directors.
This Power is solicited by and on behalf of Stev  S. Biss, Esquire.

The matters to be acted upon by Mr. Biss a  e set forth in the attached written
consent of stockholders in lieu of meeting ("Conse t"). This Power confers discretionary
authority upon Mr. Biss to act as your attorney-in- ict. Mr. Biss intends to use the Power
to execute and deliver the Consent and take the act on specified therein on behalf of the
stockholders in lieu of a meeting. You may withh( ld authority to vote for any nominee
to the New Board of Directors by lining through th  name of such nominee.

I acknowledge receipt of a definitive proxy statement concurrently with this
Power.   Given by me on May 28, 2003.

By: _Emery M. Metzler_

_EMERY METZLER_
(Print Name)

May 27, 2003

John G. Pollock
9839 Bay Meadow
Bonita Springs FL 34135

RE:   Power of Attorney and Revocable Proxy to Vote Shares
      of Brandaid Marketing Corporation

To Whom It May Concern:

I/We, John G. Pollock, being the holder(s) of _____ **197,208** _____ shares of common stock, par value $0.001 per share of Brandaid Marketing Corporation ("Registrant"), do hereby make, constitute and appoint STEVEN S. BISS, Esquire, as my/our true and lawful agent and attorney-in-fact (hereinafter referred to as "Agent") for me/us and in my/our name, place and stead to act by proxy, to execute any consent or dissent to corporate action, and to votes my/our share at any special meeting of the shareholders of Brandaid, and to perform all and every act necessary or incidental thereto. I hereby consent to notice of any action taken by my Agent by email, facsimile transmission or regular mail.

This Power of Attorney and Revocable Proxy ("Power") shall remain in full force and effect until revoked by me in a writing delivered to my Agent. A facsimile copy of this Power shall be as good and sufficient authority for all purposes as an original.

**This Power is not solicited on behalf of the Registrant's board of directors. This Power is solicited by and on behalf of Steven S. Biss, Esquire.**

The matters to be acted upon by Mr. Biss are set forth in the attached written consent of stockholders in lieu of meeting ("Consent"). **This Power confers discretionary authority upon Mr. Biss to act as your attorney-in-fact. Mr. Biss intends to use the Power to execute and deliver the Consent and take the action specified therein on behalf of the stockholders in lieu of a meeting. You may withhold authority to vote for any nominee to the New Board of Directors by lining through the name of such nominee.**

I acknowledge receipt of a definitive proxy statement concurrently with this Power.

Given by me on May 27, 2003.

By: _John G. Pollock_

JOHN G. POLLOCK
(Print Name)

Charles Grande 561 229 8 78

TO:17722296170          P: 2/2

May 27, 2003

Charles Grande
9950 S. Ocean Drive Apt 705 Street
Jensen Beach, FL 34957

RE:   <u>Power of Attorney and Revocable Proxy to Vote Shares
      of Brandaid Marketing Corporation</u>

To Whom It May Concern:

I, Charles Grande, being the holder(s) of 4,75 l shares of common stock, par value
$0.001 per share of Brandaid Marketing Corporation ("Registrant"), do hereby make,
constitute and appoint STEVEN S. BISS, Esquire, my/our true and lawful agent and
attorney-in-fact (hereinafter referred to as "Agent") or me/us and in my/our name, place
and stead to act by proxy, to execute any consent or lissent to corporate action, and to
votes my/our shares at any special meeting of the sh reholders of Brandaid, and to
perform all and every act necessary or incidental the eto. I hereby consent to notice of
any action taken by my Agent by email, facsimile tr nsmission or regular mail.

This Power of Attorney and Revocable Prox / ("Power") shall remain in full force
and effect until revoked by me in a writing delivere to my Agent. A facsimile copy of
this Power shall be as good and sufficient authority for all purposes as an original.

**This Power is not solicited on behalf of th Registrant's board of directors.
This Power is solicited by and on behalf of Steve S. Biss, Esquire.**

The matters to be acted upon by Mr. Biss ar set forth in the attached written
consent of stockholders in lieu of meeting ("Conse t"). This Power confers discretionary
authority upon Mr. Biss to act as your attorney-in-f ct. Mr. Biss intends to use the Power
to execute and deliver the Consent and take the act on specified therein on behalf of the
stockholders in lieu of a meeting. You may withh( ld authority to vote for any nominee
to the New Board of Directors by lining through th name of such nominee.

I acknowledge receipt of a definitive proxy statement concurrently with this
Power.   Given by me on May 27, 2003.

By: _____

      CHARLES GRANDE
           (Print Name)

# EXHIBIT

# F

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

                                      **CASE NO. 06 cv 80170 -
                                      COHN**
                                      **Magistrate Judge Snow**

DAVID J. FEINGOLD,

      Plaintiff,

v.

STEVEN S. BISS,

      Defendant.

_____

## AFFIDAVIT OF PAUL SLOAN

    This affidavit is made as of the date below written and affiant sayeth the following:

    The undersigned is witness in the above styled cause of action regarding certain matters pertaining to Defendant Steven Biss and all of the information set forth herein is based upon the personal knowledge of the undersigned.

    The undersigned is over eighteen years of age and is competent to testify on the matters set forth herein.

    I first met Defendant Steven Biss in approximately 2002 when he approached me to indicate that he represented a client who he claimed to have over twenty million dollars available to invest in my publicly traded company.

    My home is located in Florida and I personally operate the majority of my business out of my home office.

1

I have literally spoken to and communicated with Steven Biss on dozens and probably over one hundred times where he either called me or sent me letters or e-mail to my address in Florida.

In addition, I am personally aware the Mr. Biss solicited dozens of investors in my company to pursue a hostile takeover of my company and that Mr. Biss was hired to act as attorney for several of the people located in the State of Florida.

Ruth M. Reed
My Commission DD233411
Expires July 20, 2007

Paul Sloan

State of Florida
County of _____ Sarasota

Before me personally appeared Paul Sloan, who is personally known to me or who did produce _Fl. Dr. Lic_____ as identification and who did swear that all of the information in his affidavit is true and correct.

Done this _28 th_ day of _Feb___ 2006.

Notary Public  Ruth M. Reed

2

# EXHIBIT

# G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06 cv 80170 - COHN
Magistrate Judge Snow

DAVID J. FEINGOLD,

     Plaintiff,

v.

STEVEN S. BISS,

     Defendant.

_____/

## AFFIDAVIT OF DAVID J. FEINGOLD

This affidavit is made as of the date below written and affiant sayeth the following:

The undersigned is the Plaintiff in the above styled cause of action and all of the information set forth herein is based upon the personal knowledge of the undersigned.

The undersigned is over eighteen years of age and is competent to testify on the matters set forth herein.

Plaintiff David Feingold ("Feingold") through the law firm of Feingold & Kam, LLC., had acted as legal counsel to Paul Sloan, an officer of a company known as BrandAid, on certain legal matters but had no involvement with a business deal proposed by Defendant Biss.

Feingold was contacted via telephone by Biss on multiple occasions as set forth below with all contacts occurring while Feingold was in Palm Beach County, Florida.

On or about early 2003 Biss contacted Feingold and asked Feingold to be a witness against Sloan and BrandAid in a lawsuit that Biss was going to be filing.

14

Biss has since, after all of his lawsuits against Sloan, now filed another lawsuit against Slaon. (case number 2004 CV 353). That would make his fifth lawsuit against Sloan. Also, finally, Biss sued Feingold as a party in the case as well. The case is know as Medsker v. Feingold and Sloan and true to form, Biss simply filed a baseless and harassing lawsuit against Feingold as Biss promised he would do.

At the end of 2005, Biss contacted Feingold indicating that Biss would drop the lawsuit against Feingold if Feingold would simply sign an affidavit that Sloan had done all of the items complained of in the lawsuit. Feingold advised Biss that "Mary Carter" agreements are illegal and that Biss' claim against Feingold was completely frivolous and once Feingold won, Feingold would be pursuing Biss. Biss then advised Feingold that Feingold should realize who he was dealing with, Biss claimed that had a number of issues in his past that showed that Biss would do anything to defeat anyone and he would not rule out breaking the law.

In particular, Biss gloated that (1) he had an association with a convicted felon and the ability to purchase and influence public officials (2) He was planning to engage in a scheme with his convicted felon partner to purchase the mortgage of his enemy Paul Sloan and thereafter evict Mr. Sloan (3) He was attempting to influence the U.S. Attorney to prosecute Paul Sloan (4) He threatened to initiate a bar complaint or find someone that would initiate a bar complaint on any lawyer that would pursue him or challenge him (5) He threatened to file baseless litigation to bankrupt Feingold and said he could load on the lawsuits just as he did to Sloan (6) He even gloated that he has been reported to the Virginia Bar on numerous occasions and he does not care because they will not do anything. (7) He further gloated that he had been found by federal judges to

16

have acted improperly but noone has ever really punished him so he will continue to act however he wants.(8) He also further gloated that he had filed lawsuits on behalf of people he does not even represent one of which was dead and that he will continue to use that tact if necessary.

In short, Biss gloated that he has a history of illegal conduct and if Feingold did not simply assist Biss, that Biss would turn all of those tacts towards Feingold. Biss indicated that he was trying to change his law practice and close out the chapter of his life with Sloan and if Feingold helped him, he would help Feingold. Feingold advised Biss that Biss had no evidence, that Biss' threats were ridiculous and that Biss knew he had nothing on Feingold and was looking for a way out to pursue his claimed new legal career. Biss' final statement was that he was able to convince the present "group of idiots" he represented to actually pay him a retainer and he would continue to search for clients to sue Feingold if Feingold would not simply help him against Sloan. Biss stated that Sloan has always been the target but that Feingold was put in the fifth suit because of refusal to help with Sloan and he was running out of ways to sue Sloan. However, he warned that Feingold would see more actions against him if he did not help against Sloan.

17

Each phone call that Biss made to me was received by me at my law offices which are located in Palm Beach County, Florida.

David J. Feingold

State of Florida
County of Palm Beach

Before me personally appeared David J. Feingold, who is personally known to me or who did produce __U cense__ as identification and who did swear that all of the information in his affidavit is true and correct.

Done this 26 day of Feb 2006.

Notary Public

18

# EXHIBIT

# H

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06 cv 80170 - COHN
**Magistrate Judge Snow**

DAVID J. FEINGOLD,

      Plaintiff,

v.

STEVEN S. BISS,

      Defendant.
_____/

### AFFIDAVIT OF SEAN ZAUSNER

This affidavit is made as of the date below written and affiant sayeth the following:

The undersigned is a witness in the above styled cause of action and all of the information set forth herein is based upon the personal knowledge of the undersigned.

The undersigned is over eighteen years of age and is competent to testify on the matters set forth herein.

On or about Friday, January 27, 2006, Defendant Biss contacted me, Sean Zausner. I am an individual that resides in Palm Beach County, Florida and I received the telephone call communication from Defendant Biss while I was in Palm Beach County, Florida.

On said telephone call, Defendant Biss advised me that he presently had a lawsuit pending against Paul Sloan and David Feingold as well as other people with whom I was

19

familiar. Defendant Biss stated that he would be suing me if I did not help him and sign an affidavit against Sloan and Feingold. I asked Biss what he wanted in the affidavit and Biss said he wanted me to sign an affidavit that said Sloan stole $4.6 million and wired that money to the Bahamas and that Feingold taught him how to do that. I told Biss that was ridiculous and that I would not sign such a statement. Biss then stated, Sloan is a criminal, he wired $4.6 million to the Bahamas and Biss claimed to have written proof of that. Biss further stated that Feingold is a criminal as he knows Sloan did this and Feingold is Sloan's personal lawyer and he will not tell me where Sloan's put all of the money and therefore Feingold is a criminal because he knows how Sloan stole the money and Feingold showed Sloan how to launder money and I have written proof of Feingold doing that.

Biss then told me that if I did not sign an affidavit to help him, that he would then find a way to sue me. Biss further stated that he has had lots of trouble with the law and courts in the past and that does not bother him and I better re-think my position because Biss will do anything and pursue me as well.

20

The statements that Biss made to me about Feingold were made over the telephone

and the statements were delivered to Palm Beach County, Florida and intended to be

delivered there as I was located in Palm Beach County, Florida when Biss made the

telephone call to me.

_____
Sean Zausner

State of Florida
County of Palm Beach

Before me personally appeared Sean Zausner, who is personally known to
me or who did produce ___license___ as identification and who did swear that
all of the information in his affidavit is true and correct.

Done this __1__ day of __March__ 2006.

_____
Notary Public

OFFICIAL NOTARY SEAL
BILL WEBB-FORBES
COMMISSION NUMBER
DD109299
COMMISSION EXPIRES
APR. 09 2006

21